Case numbers 23-37-68 and 24-38-18. OPAWL Building AAPI Feminist at all versus Dave Yost at all. Oral argument to be 15 minutes for plaintiffs, 20 minutes for defendants, and five minutes for amicus. Counsel for the appellant, you may approach. Good morning. My name is Madhura Sridharan and I represent the appellants in this matter. May it please the court. This is a case about representative democracy and who all can participate in it. Citizens can, non-citizens cannot. That is the line that Ohio has drawn in section 121 and it passes constitutional muster. Now, before I sit down today, I'd like to discuss three aspects of this case. The first and most obvious is the first amendment claim. It's been the bulk of briefing before this court, the bulk of the district court's decision, as well as the stay order. But I'd also like to talk about the misshapen injunction itself and why should this court disagree with the state and leave the injunction in place? The injunction should be reshaped along two dimensions. And third, if this court agrees with the state of Ohio, either by reversing the injunction or reshaping it, which I hope it does, then I think we get to underlying the cross appeal, which is what plaintiffs call it. I do think it's an alternative way to affirm the misshapen injunction. Again, I do think the right course of action there would probably be to send it back to the district court to take a first pass at that issue. Nevertheless, there is enough, I think, to decide on that pure legal issue here, other than the district court's first pass at the issue. So saying I'd like to dive directly into the First Amendment claim here. Ohio passed Section 121 in order to advance one goal. And that goal is to prevent foreign influence. What do you think foreign means? Would Ohio have the same interest? Say a bunch of Californians wanted to participate in a ballot initiative. Would Ohio have the same interest because that would be foreign? Californians can't participate in Ohio elections. So could Ohio ban Californians from spending money on candidates or issues? No, I don't think so, Your Honor. What's the difference? The difference is citizenship and citizenship matters. I do think if Ohio tried to restrict out of staters from speaking in our elections or contributing to our elections, we'd run up against other constitutional guarantees. And I'd like to point out that the Blumen Court actually did address that particular point and explained exactly what I just said, which is that citizens vis-a-vis other states. So citizenship, it wouldn't matter if it was incorporated by what a bunch of original scholars think it should be incorporated by, which is the Privileges or Immunities Clause. But why should it matter if we accept current doctrine, which we must, that it's incorporated via due process, which means person? Well, I think the answer to that, Your Honor, is again, citizens of other states enjoy different rights vis-a-vis other states. I mean, just take the Dormant Commerce Clause, for example, which disallows states from discriminating on the basis of economic rights. I mean, I don't mean to draw on various areas of other constitutional guarantees. But again, when the states entered the union, I think they gave up the rights to discriminate in myriad ways against citizens of other states. And with respect to restricting speech in the campaign finance area, I think the only appropriate reason to restrict citizen speech would be to stop quid pro quo corruption. So I think advancing the interest of restricting pernicious foreign influence in our elections would not hold water when it comes to citizens of other states. Can you spell out what you mean by pernicious foreign influence? Yes, Your Honor. And how it would differ from the influence of a person in California? Well, I think, again, I'd like to set aside the idea of citizens of other states. I mean, if a Californian is... Well, I know. I'm not, I just, in terms of, I mean, you say it's pernicious foreign influence. Yes. How is it pernicious? And how does that contrast with the influence that a person from another state might have kind of from the outside in Ohio's elections? Two answers to what pernicious means. I keep emphasizing the word pernicious because this is about campaign finance. Now, when we talk about finance, we're talking about expenditures and contributions. We're talking about money. We know. And in the context of campaign finance, the Supreme Court has already recognized that money corruption that can be targeted by restrictions on money in elections is quid pro quo corruption. But that does not mean that there's other forms of corruptive influence of money. When it comes to the citizen, non-citizen distinction, the pernicious influence I speak of is the perception or the actual interference of foreigners or foreign money in our elections. But if we can get beyond the conclusory assertion that foreign influence is bad, I guess what I'm driving at is like, why is it bad? Okay. So I understand your point about appearance and how citizens of Ohio might think that, you know, I mean, I don't know. Foreign elements or something are driving election outcomes. But I mean, why is it bad? Well, a couple of answers. Sorry, Your Honor. No, sorry. I went over my time. Go ahead. Well, I think when it comes to this question, citizenship really matters. And when I say question, I'm talking about the concept of self-governance, representative democracy, and the notion of defining what political community is. In fact, if you look at the quartet of cases that Blumen relies on to conclude that, in fact, states have a compelling interest in preventing foreign influence in their elections, that quartet of cases defines the limits or tries to understand the limits of what all constitutes the kernel of representative democracy. What is it that we allow people to do vis-a-vis their citizenship status when it comes to the process of self-governance? And I don't think the Blumen court is binding on this court here. And the district court recognized that. And the state panel recognized that, that, in fact, it's almost a, I guess, if you were to look at Citizens United, for example, that states have an interest in protecting their processes of self-governance from- I don't want to harm your protected. It's just all opaque to me. Your interests are amorphous. How is it, so usually, the First Amendment, the court has so many cases about how more speech is always better. And if it's bad speech, then you counter it, not by restricting the speech, but by having more speech. Why is foreigners paying for speech? Why is that bad? So they can't vote. I would understand if they're fraudulently voting, then yeah, okay, obviously, they can't participate in democracy in that way. But what is the harm from foreigners speaking about the elections? Why is that going to cause any concrete harm? Well, a couple of answers. First, with respect to it being amorphous, the Supreme Court has already recognized that issues surrounding public confidence in the integrity of the election might be abstract, but it is nevertheless compelling. Second, when it comes to more speech versus less speech, more speech is not always better or else we wouldn't have any restrictions at all that would be upheld. And in the context of campaign finance, the Supreme Court has recognized restrictions are permissible when it comes to particular types of corruption with respect to citizen speech. With respect to non-citizen speech, it's just a different compelling interest in protecting the election from being undermined by the flows of foreign money that go into it. And again, there are other avenues available for non-citizens to speak and to speak on political matters. They can, of course, march. They can make a poster. They can post on social media. This is not about tamping down on non-citizen speech. It's about protecting the election integrity by preventing untraceable amounts of foreign money from entering into the elections. It's just a matter of protecting... How do you tie this to the restriction on lawful permanent residence, which, I guess, you know, our case law says we treat them almost as citizens. So how do you tie the restriction here? I think Your Honor pointed out exactly where I would go with that, which is almost. They still pledge allegiance to a different flag. And with respect to the line that Ohio drew, Judge Tappara already pointed out that that is the brightest line as it gets with respect to citizen and non-citizen speech. Non-citizens means, yes, all non-citizens. And in the context of... But lawful permanent residents have First Amendment rights. So, I mean, how are we able to restrict their First Amendment rights in this particular context? I agree that they have... Well, I agree that they do have First Amendment rights writ large. With respect to whether they have them in this particular arena of representative democracy, we have reserved that question. There's some doubt with respect to that. But assuming that they do... Where does the doubt come from? Sugarman v. Dougal, footnote 13, at least points out some doubt as to whether non-citizens should have the same panoply of rights when it comes to representative democracy and the various layers and everything that goes along with that. But I do want to get to the second point I wanted to make here, which is that the FERC restriction that... Sorry, the FECA restriction that the Blumen Court addressed was actually challenged as under-inclusive for failing to include lawful permanent residents. And now the Blumen Court reserved that question for another day. But again, going back to what the state panel said and what Judge Tappar said, there's no brighter line than to say, yes, all non-citizens. Yes, every person who does not pledge allegiance to the flag of the United States. Blumen suggested that FECA could be problematic if it didn't have the carve-out for lawful permanent residents. Well, I think the court in addressing the under-inclusiveness challenge explained why excluding lawful permanent residents would not be fatally under-inclusive and concluded that the restriction still survived. Sorry, the FECA restriction still survived. That being said, it does go out of its way at the very end to say we're not making any remarks about whether the law would be constitutional if applied to lawful permanent residents. And I think that reservation is critical here. I agree that lawful permanent residents are more significantly entangled in the social and political fabric of the country. But when it comes to representative democracy, as Judge Murphy pointed out, I don't think we'd bat an eye when we say non-citizens are not allowed in the ballot box. We know from Supreme Court precedent that they can be excluded from the jury box. It goes without saying that after Blumen, the donation box is also a place that forms a part of representative democracy in the process of self-governance. And that's all Ohio is trying to regulate here. Don't you think you need to show, when you say you have a compelling interest in preventing foreign influence of your elections, Ohio elections, in the RFRA context, the court has suggested that the government doesn't necessarily have a compelling interest in every percentage point in which its interest is advanced. So it seems to me you actually, it should be more nearly tailored and you have to say that you have a compelling interest in preventing lawful permanent residents from influencing your elections. And why should we view them as analogous to, say, like the government of China trying to influence elections? These are folks that have committed to at least staying here permanently, hence the permanent residency. So they aren't necessarily analogous to, say, foreign government meddling. It may not be analogous in every other sense, Your Honor, but they are certainly analogous in that they're not citizens of the United States. And even putting aside the furthest extremes, which would be a foreign government, which does not even have First Amendment rights. When we talk about other non-citizens who are non-permanent residents, I mean, I think we can all agree and the district court certainly agreed that the law is tailored as to them. When it comes to lawful permanent residents, despite the fact that they may enjoy other rights, none of them go toward the kernel of representative democracy. Again, I keep going back to that quartet of cases that Blumen discusses, which really set out the idea of who all are allowed to participate in political community. And the state has the right. In fact, I think Ohio Section 121 is about as cleanly tailored as can get with respect to citizens and non-citizens. Non-citizens means, yes, all non-citizens. You alluded to this earlier, perhaps, but can you tell us, do lawful permanent residents swear an oath of loyalty to the United States as part of the process of becoming one? I'm not sure, Your Honor. I do know that when a person is naturalized, they do swear an oath. I know that too. It would seem to be a significant... I mean, I think it could be. I'm happy to figure that out if I can on rebuttal or provide additional information as to that. But I do know... You can figure it out for rebuttal. Otherwise, we'll figure it out, I guess. Great, Your Honor. But I do think, again, it's about who you pledge allegiance to. If your passport is not a United States passport, you are a non-citizen. And you can get as close to the citizenship line, but citizenship matters. And I think that Section 121 makes that perfectly clear. So just so I can understand, I mean, how exactly would you distill what the compelling interest is in response to Judge Murphy's question in preventing this sort of involvement, donations, et cetera, by lawful permanent residents? Well, it goes directly to what the Blumen Court already upheld as a compelling government interest, protecting the integrity of the election from foreign influence. So it's just the same thing? Yes, Your Honor. It is exactly the same thing. I have 44 seconds here. I'd like to really quickly turn to the scope of the injunction. The injunction is misshapen in two ways. First way, after Trump v. Casa, the Supreme Court has already said that district court can't extend an injunction past the plaintiffs before the court. It has to at least be shrunk in that scope. And second, with respect to what the court did with, despite agreeing that Section 121 is lawful as applied to other non-citizen, non-permanent residents, the court nevertheless crafted an injunction that included them, and that needs to be shrunk. I'm happy to... Isn't the court precluded from sort of rewriting the legislation? Well, Your Honor, I think the concept of writing or rewriting is exactly what the district court fell prey to. When it did the analysis of what the injunction should look like, and I do want to... Is it okay if I finish answering the question? With respect to what the district court did there, rather than analyze the law and say, well, this is unlawful as applied to lawful permanent residents, and then enjoin officials from enforcing Section 121 against lawful permanent residents, as it should have done, it understood an injunction to mean that the court can strike down a portion of the law. And that's a wrong way of looking at what an injunction actually is. And that's what's led to this misshapen relief granted by the district court. I see I'm out of time. I'm happy to answer any questions. If not, I will... When you come back, I'm going to ask you about whether you need to come up with evidence in support of any of the factual or more concrete ends that you're advocating for. I'm happy to answer that now or on rebuttal. You're in the red. So I just wanted to give you a heads up and also give opposing counsel a heads up that I was interested in that topic. Thank you, Judge. I'll be ready for that. We'll hear from Ms. Frost. May it please the court, Elizabeth Frost here on behalf of the Appellees and Cross Appellants, Opal, Northeast Ohio Coalition for the Homeless, and three individual Ohioans, a mix of lawful permanent residents and US citizens. I'd like to begin, Judge Murphy, with your question about what do you think foreign means? Because I think this is exactly at the heart of the issue. The United States Supreme Court held in Verdugo or Quides that the people, the word the people in the First Amendment refers to the people who are part of a national community. And Blumen echoes this. It really talks about the national community. And when then Judge Kavanaugh, now Justice Kavanaugh, is writing about why they're not the lawful permanent resident question may be different, he comes back to this. And I think the language he uses is really, really important. What he says is that in excluding lawful permanent residents, it could make the law more narrowly tailored to the precise interest at question. And that interest is, of course, this interest that we keep hearing repeated over and over in a very generalized way. But I think that interest really is about who is within the American community for the purposes. Well, OK, I mean, that's looking at that question, I guess, in a more general sense and who's in the community. But why doesn't the state have a point that if an individual can't influence the outcome of elections by voting, then it follows that the individual lawfully can be excluded from influencing the election by, say, donating $50,000 to a particular, you know, in support or against, say, a ballot initiative? Yeah, I think the United States Supreme Court has just repeatedly rejected that. I mean, it rejected it in Citizens United. Corporations can't vote. Blumen talks about this, too, how there are members of the American community, including corporations, people under 18 years old who can't vote, who still have these First Amendment rights to speak. And, of course, money is speech in these environments. But, I mean, doesn't the state have a point that the status of the speaker does matter? I mean, the fact that somebody here on a student visa or any other kind of, you know, temporary visa, those persons lawfully can be restricted. I don't understand your brief to challenge the lawfulness of these restrictions on their First Amendment rights. I mean, and so the point being that these rights are not absolute. And the person who seeks to exercise them, the status of that individual matters as to whether they can be infringed. Certainly. I agree with you that they're not absolute. I think the United States Supreme Court has been clear that, for example, non-citizens outside the United States, that's a question. You're absolutely right that we are not raising the question of whether non-lawful permanent residents themselves could be individually restricted. I think if this were a law that was just a restriction on individual spending, I think you wouldn't be hearing from us on that particular issue. You would just be hearing from us on lawful permanent residents. Right. I think where the non-lawful permanent residence piece becomes an issue in Ohio's law is how it relates to domestic organizations, totally American speakers, no one disputes, like OPAL and NEOC, you know, who may have taken dues or membership fees or something from, you know, a member who happens to not be a lawful permanent resident. I think that's where you get into some of the overbreath and the chilling of what can they do? Can they speak? Now, is that a compliance point you're making about just sort of the burdensome nature of complying with this requirement? I mean, just somehow showing or certifying that they have not accepted money from foreign nationals? I think part of the problem is that the law is so broad that it does impede no one knows how to comply. But also there's nothing, there's nothing in Blumen, there's nothing anywhere that allows for this sort of second-handed foreign influence prohibition where you can say, just because some money that an organization has happened to have had a source that's not an LPR, they suddenly can't speak. I mean, I think that's made pretty clear in Citizens United where it says, if there is an interest in prohibiting foreign influence in the space, it would be limited to foreign governments. I think that if you look at the First Circuit case and the Minnesota case, they both, I think, really get into this, this idea that just because there's sort of money in the pool, you know. But you don't think, so if the Chinese government gave a check to a union, you think it would violate the First Amendment for the union to use that money? No, I don't. On the fact that it's a lawful permanent resident versus? No, Your Honor, I don't. And we don't challenge, to be clear, the foreign government piece of this, including the directly or indirectly. When you talk about burdens, though, I think the burdens are there indefinitely. Don't you have to make sure that the money's not coming from the Chinese government? Well, here I think this does go to an evidentiary piece, which there's no evidence that any of these domestic corporations are, in fact, taking money from a Chinese government. Oh, no, I know. I'm just saying in the abstract, your point about it's burdensome to have to ask the folks where the money is coming from. And my response would be, that is going to happen no matter what. Because you concede that you can restrict certain flows of money from foreign governments. And therefore, you ostensibly have to ensure that it's not coming from a foreign government. I think a different law that was narrowly tailored would raise different questions. I think part of the problem with this law is it's so broad that it's not just, you know, are you affiliated with the Chinese government? It's every LPR, it's everyone. And I think there's 160,000 legal permanent residents in Ohio. There's 11 million in the United States. I mean, there's no evidence at all that Ohio needed to do this because LPRs. And this, I think, Judge Kessler, goes to a question you asked my friend on the other side. There's no evidence at all that any of their speech is some kind of pernicious foreign influence. It's simply speech. But I mean, what support do you have for the proposition that this is akin to kind of some of the more fact-intensive interests that are sometimes asserted in support of speech limitations in the moment? You know, that there's going to be some riot or kind of major, I don't want to get too specific, but I mean, sometimes the interest that the state invokes to restrict speech is, you know, like fire in a crowded theater kind of justifications. And, you know, if that had never happened, maybe they'd have to go into court and say, you know, maybe in the first instance they'd have to make a showing that that actually presents a danger. But they're saying that this is different from that more concrete, fact-intensive kind of interest, that this is almost kind of an attribute of, I don't want to, I mean, sovereignty is a way overused word, but this is something that inheres in a political body that when you reduce to their decision-making, that they're entitled to exclude outsiders and also to exclude the influence of those outsiders. And do they really need, what do you, I mean, what kind of evidence would they have? We come in and like, you know, somebody gave money. I mean, I think they're saying this is more like a priori, that this is the nature of their organization, so to speak. Yeah, a couple of responses to that. So Belotti said that a law that criminalizes a broad swath of voices in ballot issue conversations runs contrary to the First Amendment's basic tenets and would need to be supported by great or imminent danger. That would be true of people here on a student visa, and they want to speak too, and their voices too. And, you know, all this kind of First Amendment kind of Hosanna stuff doesn't apply to a bunch of people that, a bunch of people. But it does apply to the legal permanent residents, which are the people that Ohio decided to include in this law. And that was a conscious decision. The Ohio legislature... Okay, but I mean, I guess it seems conclusory to say it applies to LPRs. My question is about, I don't mean to give you a hard time, but from an evidentiary standpoint, it's an important question. Must they come up with evidence in support of their compelling interest, I guess? Yeah, I think the answer is yes. I think Blumen indicates as much. Blumen points out that Congress had a evidentiary record that it based its decisions on. I think, you know, at some point Ohio analogized to the Holder case, which involved terrorism. There's no evidence, by the way, that LPRs, any of these LPRs are terrorists. But there, there was an extensive record. And that's obviously an imminent threat, right? On some kind of record. Here, not only is there no record, there's a couple newspaper articles talking about rumors that are in the record that Ohio put in. But also, the legislature, actually one of the sponsors said a few times, probably the spending had no impact on the election at all. I mean, that's at record 16-7, 543-64, and again at 634-35. So not only did they have no evidence, their contention that they had to do this is actually contrary to the evidence in the record itself. And I think that's a problem. And I mean, Your Honor wrote that even when you're talking about exacting scrutiny in the Labin case, Buckley requires a demonstration, not a recitation. And here, Ohio hasn't even bothered to make that demonstration. I think I was drawn by the sort of alliteration there. It's a good line. But also, it's a comparative case in the sense that an issue in that case where the court was rightfully concerned about the fact that the law would impede on the First Amendment speech of over 100,000 Medicaid providers in Ohio. Here, without any evidence. What was the name of that case again? It was Labin v. Husted.  All right. It's, yeah. Not ringing a bell. Well, I'll tell you, it's been 17 years. So it's hard to keep track sometimes. Fair, fair. But Ohio justified it based on a concern about fraud. And they actually had evidence there was Medicaid fraud. I mean, I don't think any of us here would be surprised to hear that. They did not have evidence that there was a reason then to prohibit the First Amendment speech of every Medicaid provider. If I may. So the way this statute seems to leave things, though, I mean, you talk about First Amendment voices and so on. I mean, these folks are free to speak in, like, the usual sense, okay? With yard signs and, you know, op-eds and all that kind of more traditional speech. They can do that all they want. So those voices can be heard to that extent. But Ohio has drawn a line about participation or influence upon the decision-making process itself. Yeah, but then that raises the question of why? If the concern is influence, the ultimate influence is actually happening now with the money. Well, okay. Let me give you this hypo. Let's suppose, I'll make this even-handed. Let's suppose that George Soros and Elon Musk are actually both LPRs, not U.S. citizens. And they pour, let's say one of them, pick the one you like least, pours $200 million into some ballot initiative in Ohio. Wouldn't folks in Ohio, after that experience, be able to say, you know what? I mean, we're going to exclude this kind of influence from people who can't influence our elections by voting. Right. And I believe that's exactly what the people of Maine tried to do, frankly. If you look at that case with the First Circuit decision that came down, that was a ballot initiative passed by the people, 84%. Yeah, that was true. And you know- Which way did they come out again? They said it was unconstitutional. And that law was much, much, much more narrowly tailored to- Why? I mean, like, you know, the Blumen whatever case and the First Circuit, we're not bound by those. Correct, that's correct. They're not like holy writs in this court. And so why in the hypo I gave you? Why does the Constitution say, you know what? You've got to keep letting Elon Musk pump 200 million a year into whatever cause he might have in your elections. Even though he can't vote, he can do that. Because at the end of the day, the voters make the decision. At the end of the day, the voters go into the voting booth and they make that decision. Isn't that sort of, you know, just kind of blinding oneself to the reality of this actual- The campaign could have a very significant influence, and it is a foreign influence in the sense that the person isn't sworn to loyalty in the United States- Or to the United States. I just think the United States Supreme Court recognized that and said, so the answer is more speech. And in fact, when you're in the issue advocacy space, when you're in the ballot issue advocacy space, because the people are ultimately making the decision, it's actually more important that they hear all these diverse voices. And at the end of the day, there's something highly paternalistic about Ohio's law here, where it assumes the people are going to be swayed by this or that or the other and are not making their own minds. And I think I go back to the statement that one of the bill's sponsors made in the legislature conceding that the money that they were concerned about probably didn't change things. At the end of the day, the people of Ohio made the decision. They should be allowed to continue to hear those voices and make those decisions. Can I ask one final question, if it's okay? Of course. So what's wrong with the analogy of the equal protection cases seem to draw this divide between economic issues and sovereignty issues and apply something akin to strict scrutiny to economic issues and something akin to rational basis to sovereignty. So the sovereignty case law has allowed lawful permanent residents to be excluded from teaching, probation officers and the like. Why can't we draw from that the same dichotomy and just expand it over to the First Amendment, that it should be strict scrutiny except in this area of sovereignty? Yeah, a few reasons. I think, first of all, the equal protection doctrine doesn't guarantee you a right to have any kind of job. And the questions in those cases are, can you treat these different people differently? Whereas the First Amendment does guarantee this right. So I think that's the first reason. And that's the reason that other courts that have looked at this have sort of rejected this analogy. I think another reason is if you look at those cases themselves, they're very narrow. They don't say you can exclude non-citizens or LPRs from any job. They say you can exclude non-citizens or LPRs from these jobs where they're actually making the decisions. Well, wouldn't you, though, concede that speaking on an election is closer to the interest than just generically being a teacher? I think that the logic of those cases would apply even more so here than there. I'm not sure that's right if you look at the cases and how they talk about teaching. They talk about teaching as making discretionary choices while you're in the classroom, about this and that and the other. The thing is, as a ballot issue, it is what it is. It says what it says. No amount of speech is going to change what it says. I mean, in fact, this isn't even triggered, although it's a little unclear when it's triggered. But it's not even triggered until there is a ballot issue that is already set in writing. And so I think they're just fundamentally different. Thank you so much for your time. I appreciate it. We really appreciate your argument. And we'll hear from Amicus. May it please the court. I'm Jason Walta for the Amicus Ohio Education Association. And I appreciate the time to argue this important case, which asks whether the state can use a speaker discriminatory, overbroad law to criminally punish and declare as pernicious U.S. domestic unions, U.S. domestic nonprofits, and even U.S. citizens when they engage in electoral speech, speech where the First Amendment has its fullest and most urgent application. And the answer is plainly no. And I'll focus on just a couple of reasons why that's the case. Where I want to start is on the speaker discriminatory aspect of this law, because Judge Kethledge and Judge Murphy, you both raised a couple of hypotheticals involving foreign influence. Judge Murphy, you talked about whether the Chinese government could give to a union. And Judge Kethledge, you talked. So the reality is under the Ohio law, if the money is invested or given to a business corporation, it's lawful. And this law has nothing to say about it. And so this... Would it cure the problem if they couldn't do this either? I don't think it would cure the problem. It would run into other issues. But the speaker discriminatory aspect of this law, that it would allow the Chinese government to give millions of dollars to a business corporation and for that corporation to turn around and influence a ballot measure or to make independent expenditures and to restrict a union or a domestic nonprofit from doing the same. That's blatant speaker-based discrimination that is prohibited. So it's an absolute bar. So if under this law, if money is given to a corporation, not as... I thought the interest was if it's a foreign shareholder. But if the Chinese government just gave a whole bunch of money to, I don't know, GM, then GM could spend that and there would be no problem? Not as far as I know. One of the oddities here is the way that Ohio defines contribution. Under federal law, the federal law in Blumen and under most state laws, a contribution is money that is given for the purpose and received for the purpose of influencing an election. Ohio has a much more expansive definition. It's money that's given for the purpose, received for the purpose or merely used for the purpose. So even if a, let's say a bar association member who's an LPR, just pays his bar dues and the bar association uses those dues and he has no intention for it to be used for a ballot measure. But if the bar association uses those dues to advocate on a ballot measure, it's criminal. I mean, that's a compliance issue and the state at least says that these organizations, unions, et cetera, have much more burdensome compliance requirements under extant law that we're not saying it renders all that stuff. I think this is really where we get into the question of how the strict scrutiny standard applies, right? The legislature made no findings in this respect on the relative burdens on nonprofits and unions. Is it your contention here today that this requirement, you know, that people say in your hypo, that you set aside funds that include contributions from LPRs and you have some kind of, you know, separate pile and use a different pile for this kind of speech? Is that more burdensome do you think than what your organization, the Ohio Education Association currently complies with? Oh, absolutely. Your Honor, you have to understand the context here. Start with the fact that one of every 100 Ohioans is an OEA member, right? So a huge number of people. And these people are existing members. They are already paying dues. And almost all of them... I'm sorry, sir. You finished. That's rude. Go ahead. Well, almost all of them pay dues by payroll deductions, which are collected by their school district and paid, you know, in a lump sum to the union. So it's not differentiated when it arrives to them. If I may, I mean, are your members able to say, I don't want to contribute to political activities of the union? Oh, and they do. But this...  But this is the dues...  Yes, I... And so somehow you're segregating funds for, you know, from those people. Why is it so much worse if you would do an analogous segregation? Because we segregate funds for, you know, our PAC, for example. And you have to be a citizen to apply... to contribute to the PAC. And we require everyone to affirm that. But these are the general treasury funds of the... general treasury funds of the organization. But they need not be, I guess, is what I'm saying. But anyway, I... So we would have to reorder our operations entirely, identify who is a lawful permanent resident. Because the political funds are given voluntarily, right? But... Well, if you... I know I kind of took up some of your time. So why don't you take a minute to finish up whatever, you know, points you want to make. Okay, I just want to make one last point, which is that Citizens United is directly controlling here. They address this issue of foreign influence. They said that a law that targets foreign influence would be unconstitutional unless it applied only to an organization, to a... I'm sorry, to a corporation or association. That was created in a foreign country or that is predominantly funded by a foreign entity. That is not the case here. That is not the case with this law. And so the law runs right into that holding of Citizens United. It simply can't be sustained. Why didn't Ohio Education Association bring suit or intervene in this case? I know you're in the MECAS, but why not bring your own claim? Your Honor, I will say that we may have to bring suit on our own, especially if the injunction gets limited and the state of Ohio decides not to comply with, you know, the holding of the court as opposed to the injunction. But we stand ready to do that. All right. Well, thank you, Mr. Walter. We appreciate your point of view and your arguments. We'll hear rebuttal. I'll assure you that we'll comply with any order of this court, Your Honor. I'd like to directly begin by talking about the evidentiary issue that Your Honor asked about in the opening. With respect to whether money flowed into our elections, foreign money, this court need not look any further than the affidavits that plaintiffs gave saying that they have actually had non-citizens either spend money or who will likely spend money later. Now, with respect to whether that undermines public confidence in the integrity of the election, the idea of self-governance being shaken, well, that's the kind of abstract concept that the Supreme Court has repeatedly held does not require empirical evidence, largely because it's not susceptible to empirical evidence. And this court in Russell v. Lonergan-Grimes has also pointed out that states have special solicitude in this respect when it comes to abstract, compelling interest in the context of elections. Second, I'd like to somewhat answer your question, Judge Kethledge, about whether lawful permanent residents take oaths from our understanding. And I could be wrong, but it seems to be that they do not take an oath. And if they did, I think we would have heard that from my friends on the other side. Third, I would like to talk sort of briefly about the obtuse principles that my friend on the other side takes from various cases connecting to citizen speech. Now, of course, citizen speech and what all may be appropriate to restrict citizen speech and what are the kinds of government interests that are appropriate for that vary dramatically, especially with respect to Buckley, Citizens United. All of those talk about quid pro quo corruption, and that is the appropriate and only government interest that the Supreme Court has noted in that context. I'd also like to point out that Blumen, which was summarily affirmed by the Supreme Court, does talk about the different compelling government interest and holds that, in fact, states have a compelling government interest in protecting their self-governance from foreign influence. Last, I'd also like to talk about something that Amicus brought up, which is that in Citizens United, Amicus warned everybody that restricting domestic corporations for the purpose of preventing foreign influence in the elections would likely be overbroad. Now, Ohio was wise to heed that concern because, as the recent lesson from the First Circuit shows in Central Maine Power Company, domestic corporations often sweep in citizen speech, and when it does that, the only permissible reason to restrict speech would be quid pro quo corruption reasons. And Ohio was careful to avoid that by excluding domestic corporations. Do you think, but do domestic corporations qualify as, what is it, continuing associations? So if they actually asked for money from a foreign government in order to spend that money on an election, would that be legal or illegal under Ohio law? For the first question as to whether they are continuing associations, my understanding is that they are not. And then with respect to the second, whether they can take money from one single foreign owner and funnel it towards the election, well, that would be a circumvention of the prohibition against even indirect spending by non-citizens. So while the corporation itself may not be violating the law, the non-citizen would be violating the law. What does continuing association mean, then? And I think a continuing association is an organization that engages in advocacy. I think the way you're honored to find a corporation might fall along those lines in this pre-enforcement context. It's very hard to really see how a domestic corporation could somehow turn itself into a continuing association or whether that line would even blur. So I do want to tread carefully there. But my understanding is domestic corporations, by virtue of co-mingling ownership, are excluded ownership between citizens and non-citizens are excluded from the scope of the law. Any further questions? If you want to take 30 seconds, you can wrap up. Well, Your Honor, Section 121 is directly, as Justice DePauldry pointed out, it is a bright line drawn between citizens and non-citizens for the purpose of protecting the process of self-governance from foreign influence. And on that basis alone, this law passes constitutional muster. We ask that this court reverse the injunction. Thank you. Thank you. We thank all counsel for your very thoughtful briefing and argument. It's very important and helpful to us. Case to be submitted.